# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ISAAC PARDO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 12 C 08410 ) ) Judge John J. Tharp, Jr. |
| MECUM AUCTION INC., WILLIAM MULLIS, and JAN MULLIS, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

This case gives lie to that common adage of abductive reasoning that if it looks like a duck, swims like a duck, and quacks like a duck, then it's a duck. The "duck" in this case is a "highly prized, rare classic Corvette"—a 1967 black coupe—that looked like exactly that to the plaintiff, Isaac Pardo, a New York resident and Corvette enthusiast. So he bid on and won the car at defendant Mecum Auction's Bloomington Gold Auction in St. Charles, Illinois. Upon discovering that the dream machine was, in reality, "an inferior red 1964 Corvette" in disguise, Pardo sued the former owners of the vehicle—who are no longer parties to this lawsuit—and Mecum, which Pardo contends is no better than the proverbial used-car salesman unscrupulously seeking to pass off a lemon as a limousine. His theories of relief sounded in fraud and breach of contract.

Pardo's First Amended Complaint was partially dismissed upon the individual defendants' motion (ECF No. 31), for failure to adequately plead the fraud claims, which are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Mem. Op. & Order, ECF No. 84 (February 18, 2014). Pardo filed a Second Amended Complaint (ECF No. 101), as to which this Court partially granted Mecum's motion to dismiss (ECF No. 112),

1

holding that the contractual non-reliance clause found in his bidder's agreement foreclosed his claims for fraud and misrepresentation against Mecum. Order, ECF No. 124 (Dec. 29, 2014). The dismissal was with prejudice because of the futility of re-pleading the dismissed claims. The Court denied Mecum's motion to dismiss as to the contract claims.

Pardo moved for reconsideration of the Court's ruling on his fraud claims. See Mot., ECF No. 126 (Jan. 23, 2015). The Court denied the motion, concluding that even if Pardo had timely made the arguments he raised in that motion (he had not), it would have dismissed the fraud claims because under Illinois law, if a purchaser signs an agreement containing a clause that disclaims reliance on any oral representations by the seller, then the purchaser cannot maintain a claim of common-law fraud. *See* Order, ECF No. 130 (Jan. 29. 2015). The Court further held that absent any proffered reason the clause was unconscionable or unenforceable as a matter of law, it was appropriate to hold Pardo to his disclaimer of reliance in this arms-length transaction.

Following discovery, Mecum moved for summary judgment as to the only remaining claim. See Mot., ECF No. 159. Pardo then moved, once again, to vacate the Court's earlier dismissal of his fraud claims, in addition to opposing Mecum's summary-judgment motion on the breach of contract and rescission claims; further, Pardo also moved for summary judgment on those claims himself. See Mot., ECF No. 165. Mecum was permitted to fully brief Pardo's later-filed motions along with its own motion. See Response and Reply Br., ECF No. 171. Pardo's motions are denied. Mecum's motion for summary judgment is granted.

## DISCUSSION

### A. Plaintiff's Second Motion for Reconsideration

Pardo says that his second motion to reconsider is brought pursuant to Federal Rule of Civil Procedure 60(a), "Corrections Based on Clerical Mistakes; Oversights, and Omissions,"

which allows the district court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." This rule is plainly inapplicable in the context of Pardo's argument, which is that, in light of what discovery has uncovered, the Court's dismissal of his fraud claims was a *substantive* error of fact and law, in that he cannot be held to the contractual non-reliance clause that, he says, does not protect the seller from fraud or warranty claims. Mem. 18-19, ECF No. 167. In other words, Pardo is seeking to vacate an interlocutory ruling based on its merits, which if anything brings his motion under the ambit of Rule 60(b), which allows relief from an order for any justifiable reason, not Rule 60(a). But of course, a court always has broad discretion to reconsider its interlocutory rulings. *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694 n.5 (7th Cir. 2007).

No matter; the motion is meritless. For starters, its premise is that the Court erred in dismissing the fraud claims based on the contractual non-reliance clause because, Pardo says, that clause applies only to Mecum as auctioneer, and not as the owner of the vehicle. Pardo claims that it is only through recent discovery that he learned that Mecum owned the vehicle at the time of the auction. That is simply not correct. Pardo made the very same argument in his original motion to reconsider: "But here, however, Mecum *was* the owner of the Corvette, having purchased the car on June 8, 2011, more than two weeks before the June 25 auction …. Mecum therefore was not acting as an unknowing or uninformed Auction Company, as it held out in the Agreement, but was actually the owner and seller of the Corvette." *See* Mem. 6-7, ECF No. 127. The Court expressly addressed this argument, holding that the non-reliance provision would operate equally against seller and auctioneer:

> Finally, Pardo's argument that the non-reliance clause shields only fraud
> claims against Mecum as Auctioneer versus Mecum as seller of the

> putative 1967 Corvette is unpersuasive, both because the non-reliance clause refers to both the auctioneer and the seller, and because in any event the agreement runs to Mecum Auctions, Inc., the defendant in this case, whatever hat it may have on. Mecum conditioned its assent to Pardo's participation in the auction on Pardo's acknowledgment that he was relying solely on his own examination and inspection of any automobile on which he bid. Having provided that representation to Mecum, Pardo cannot now claim that he relied on representations by Mecum in bidding on the (allegedly) ersatz black 1967 Corvette coupe.

Order 3, ECF No. 130.

In light of the above-quoted passage, Pardo's assertion that "[t]he December 29, 2014 dismissal order was premised on the 'as-is' clause in the parties' contract protecting Mecum from liability as auctioneer" inaccurately describes the ruling, and any doubt on that score should have been settled by the Court's further explanation in response to Pardo's first reconsideration motion.[1] And given Pardo's argument in January 2015 that the fraud claims were well-pled because Mecum owned the Corvette, his current claim that he newly discovered this information (at a deposition in September 2015), which requires the Court to correct an error its prior ruling is, frankly, bizarre. This Court noted as far back as its February 18, 2014 opinion dismissing the claims against the Mullis defendants that "the complaint (which includes its exhibits) shows that 'the Mecum Collection,' not the Mullises, sold the car to Pardo." ECF No. 84 at 10. In addition,

---

[1] Pardo also argues that reconsideration is warranted because "Mecum now admits that the 'as-is' clause does not protect it in its capacity as the owner and seller of the Corvette" and that "it bore responsibility to represent the Car accurately and that the protections of the 'as-is' clause in the contract, as well as any waivers by Pardo, did not apply or accrue to the benefit of Mecum as the car's seller." Pl. Mot. 3, ECF No. 165; Mem. 2, 4, ECF No. 167. This too, is incorrect; no such "admission" is in the portions of the record Pardo cites. See Pl. Stmt. of Facts ¶¶ 17-21 and cited exhibits. Dana Mecum simply stated that the *bill of sale* between the auctioneer and buyer does not disclaim warranties or representations of any strangers to the contract. Pl. Ex. B at 78:10-79:15. The bill of sale is not the contract at issue here (the bidder agreement). In any case, the argument is immaterial, as the Second Amended Complaint brings allegations against Mecum as the auctioneer, not the seller / owner, and, as explained in n.2 *infra*., no amendments have been made to allege that Mecum was the seller/owner; the implicit amendment in the briefs is null.

4

Mecum sets forth in detail many more previous occasions on which Pardo alleged or received actual notice that Mecum was the seller. Resp. 2-3, ECF No. 171. Furthermore, Pardo fails to explain why accepting his argument would help him, as his complaint alleges that the auction company made misrepresentations in that capacity, in service of drawing a high bid. *See, e.g.*, SAC ¶¶ 10, 12, 15, 23, 28, 32, 43-44, ECF No. 102. Given Pardo's erroneous recounting of the circumstances purportedly warranting reconsideration and the inconsistency of his current factual allegations with the complaint,[2] there is no reason to (re-)revisit the dismissal ruling, and the fraud and warranty counts will not be reinstated.

B. **Motions for Summary Judgment**

Cross-motions for summary judgment require a district court to "take the motions one at a time" and to construe the evidence and make all reasonable inferences in favor of the party against whom the motion under consideration is made. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). Summary judgment should be granted if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. Fed. R. Civ. P. 56(a); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). The existence of cross-motions for summary judgment does not imply that there are no

---

[2] It would be impossible to read the complaint otherwise. The operative pleading, the Second Amended Complaint, names Bill Mullis as the owner/seller and Mecum Auction as his agent. Pardo never moved to amend his complaint to name Mecum Collection as the seller (though he did move to amend on other grounds). That is reason enough to deny Pardo's motion. He is, in effect, attempting to amend his complaint in the context of his reconsideration and summary judgment motions, which is impermissible. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012); *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008). The factual premise of his operative pleading, that the Mullises were the sellers, is inconsistent with the current factual assertion that Mecum was seller, so amendment was required. See *Colbert v. City of Chicago*, No. 16-1362, 2017 WL 985832, at *5 (7th Cir. Mar. 14, 2017)

genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). "Parties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id*.

Both parties move for summary judgment on the breach of contract claim, in which Pardo contends that Mecum "wrongfully transferred title to the Corvette to Billy Bob's without Pardo's consent, then refused to remove Billy Bob's from the title, thereby breaching its contract, which required Mecum to deliver title to Pardo within 14 days of the sale." Reply 3, ECF No. 173. Pardo adds that Mecum has never transferred the title to Pardo.[3] Mecum, on the other hand, argues that it timely performed its contractual requirement under the Agreement to process title, and further that there is no evidence that Pardo incurred any damages arising out of any alleged violation of the title-processing provision.

Based on Pardo's pleadings and argument, the Court previously defined the breach of contract claim not as one that Mecum delivered to Pardo a car other than the one he bid on, but that "Mecum has failed to deliver legally sufficient title to the car that he did bid on, in violation of the Bidder's Agreement." Pardo has not taken issue with this characterization (again, he says the provision "required Mecum to deliver title to Pardo within 14 days of the sale"). Because of the limited scope of the contract claim—whether Mecum breached an obligation to timely process and transfer negotiable title in Pardo's name—the universe of material facts is relatively small, despite the parties' long recounting of the circumstances of the disputed sale.

---

[3] Mecum could not do so now—the facts show it does not hold title.

1. **Fact Summary**

The fact summary is derived from the parties' statements of undisputed material facts, response statements, and statements of additional facts, see Local Rule 56.1(a)(3), (b)(3), to the extent the proffered facts are supported by admissible evidence and are material to the issue at hand or useful for context.

Pardo bought what he believed to be a black 1967 Chevrolet Corvette with Vehicle Identification Number 194377S111042 at Mecum's Bloomington Gold Auction, in St. Charles, Illinois, on June 25, 2011. The car was part of the so-called "Black Collection" marketed by Mecum. From 1988 to 1998, the car was registered in Virginia as a black 1967 model year Chevrolet with VIN 194377S111042. Former defendant Bill Mullis bought the car bearing VIN 194377S111042 in 2000. Thereafter the car was registered in Florida as a black 1967 Chevrolet. On June 8, 2011, Mullis sold and transferred title of the car bearing VIN 194377S111042 to The Mecum Collection Inc. (undisputedly, an alter ego of Mecum Auction). Weeks later, on June 25, Mecum Auction sold the car at its Bloomington Gold auction. Mecum Collection paid an entry fee and seller's commission to Mecum Auction for the Black Collection's auction sale, on a car-by-car basis. Mecum Auction did not disclose that its alter ego was the seller.

As auctioneer, Mecum advertised the car as a black 1967 Corvette Coupe before the auction. The advertisement stated, however, that Mecum Auction "does not verify, warrant, or guarantee this information," and that "[t]he decision to purchase should be based solely on the buyer's personal inspection of the lot at the auction site prior to the auction." Pardo had "reviewed" the advertisement for the car before attending the auction. He travelled to Illinois from New York intending to bid on that car or another in the collection. The day before the auction, Pardo executed the Gold Bidder Registration (the "contract") that permitted his

participation in the auction. The contract contains the following provisions, labeled "General Bidder Rules":

- "Purchaser agrees to accept ownership of merchandise/property at the fall of the gavel and he/she willingly assumes all responsibility and liability for said merchandise/property at that time and without exception."

- "The seller will afford every opportunity to view all lots prior to sale. However the purchaser must understand that he/she is buying property entirely upon his own or his agent's personal examination, inspection and opinion. All lots are sold 'AS IS, WHERE IS.' Any guarantees written or implied as to the authenticity, originality, or condition of any lot are not the guarantee of the Auction Company, and should be determined by the purchaser's own inspection and discretion. The vehicle and information presented at the time of auction is final and supersedes any previous representations. The information provided is deemed reliable, but is not guaranteed."

- "Should any dispute arise after the sale, the auctioneer's records shall be conclusive in all respects."

The contract also contained the following provision, under "Terms":

- "Titles on purchased vehicles will be processed in 14 working days contingent upon confirmed payment."

Mecum Mot., Ex. B, ECF No. 159-1.

Pardo checked the Corvette's VIN, which matched the number on the engine, and looked at the carburetors, which appeared to him to be the correct kind for a 1967 model year Corvette. Pardo checked the Corvette's VIN in two books, "Corvettes by the Numbers" and the "Corvette Black Book." He did not inspect the underside of the Corvette (and says, though Mecum disputes it, that he was unable to). Pardo "believed that it came from a reputable collector and that Mecum appeared to have a reputation for honesty—so he assumed the Corvette was as Mecum described it."

Pardo bid $68,500 for the car and won. He then signed the Corvette's Block Sheet, which identified the Corvette as having a 1967 model year. Before he paid, however, a Bloomington

Gold judge told him that the car was not a 1967 model year, and had fake VIN and trim tags. Pardo relayed this opinion to Robert Russo of Billy Bob's Fast Expensive Cars, Inc., an expert in older-model Corvettes who also attended the auction. Pardo had purchased a Corvette from Russo years earlier, and the two were familiar with each other. Russo, who frequently dealt with Dana and Frank Mecum (the principals of Mecum Auction) and believed he could negotiate some kind of deal with them, advised Pardo that he bought the car and should pay for it.

Pardo paid by personal check, with the auctioneer's commission added; he noted in the memorandum section that the check was for a "67 Coupe," although he already doubted the authenticity. Pardo says he paid for the car because he "feared that if he left the Corvette with Mecum, Mecum would impound it, charge him storage fees, sue him for breach of contract, seek attorney fees, and deny him access to it." According to Pardo, these actions were threatened by Steve Levine, Mecum's resolution manager, when Pardo initially balked at completing the sale. After paying for the car, Pardo had it transported back to New York.

After the purchase was complete, Mecum transferred title for the car to Russo's business, Billy Bob's Fast Expensive Cars. There is no question that Russo had approached Frank Mecum to ask that the transaction be structured this way; the dispute is whether Pardo authorized it.[4] Pardo says he did not. He maintains that he did not even know until much later that title had been transferred to Billy Bob's. Steve Levine could not recall receiving a request from Pardo to transfer title to Billy-Bob's, but he testified that such a request would require approval from Dana (father) or Frank (son). Frank Mecum testified that he approved the procedure, and a Post-

---

[4] The Court does not ultimately find the reason for this procedure material to the outcome but notes that it was Dana Mecum's understanding that this maneuver was designed to evade certain New York taxes (Billy Bob's is in New Jersey), while Russo suggested that (with Pardo's blessing) it would facilitate a settlement where he would "hot rod" the car and sell it.

9

It Note in the deal jacket contains Frank's instruction not to "do title" until speaking with him, and a further notation, "Title to Billy Bob's per Frank."

Mecum Auction endorsed the title to Billy Bob's on the day of the auction sale, June 25, 2011, and that date is recorded on the title card. Title Card, ECF No. 159-6. On June 27, 2011, Pardo provided Russo with a faxed copy of his drivers' license and insurance information for purposes of securing a temporary tag for the car.[5]

Soon after the auction, Pardo had the car assessed by Kevin Mackay, an expert in the repair, service, and restoration of Classic Corvettes (and apparently, though immaterially, a nemesis of Dana Mecum). Mackay concluded that the car had a 1964 model year body and chassis; the firewall was a 1963 or 1964 style firewall; the Corvette was originally red, not black; the VIN tag and trim tag were counterfeit; the engine was stamped; and the transmission was from a 1968 model year Corvette. Mackay, a non-lawyer believed that as a result, the car could not legally be driven. Mecum admits that it was aware of and did not disclose the car's replacement engine, but denies that it was obligated to because the engine was available for inspection prior to bidding, and the contract provides that a purchase is deemed to be solely at the discretion of the buyer or his agent based on his independent inspection. Pardo asked Mecum to rescind the purchase of the car and continued to contact Mecum until Steve Levine told him that all sales are final and thereafter refused to take Pardo's calls.

In July 2011, Robert Russo also inspected the car. Russo says that after the inspection, he called Dana Mecum and told him that the car was "made from a collage of other cars"; it had "a low quality, replacement nose that is poorly installed"; the outside sail panels were covered up with body work in an attempt to make the Car look like a 1967 model year coupe; holes in the

---

[5] Pardo admits this but nevertheless states, "Pardo did not authorize Mecum to transfer title to Corvette to Billy-Bob's." Resp. Statement ¶ 31, ECF 168.

fire wall, which indicated the Corvette was not made in 1967, were plugged; the parking brake was not functional and likely a reproduction; and the engine pad was not original. Russo says he confirmed all this, and noted that the VIN and trim tags were reproductions, in a report of June 25, 2011, that he emailed and/or faxed to Frank Mecum and Steve Levine. They deny ever receiving it.

Mecum Auction mailed the processed title to Billy-Bob's (against Russo's apparent wishes, after he had failed to convince Mecum to buy back the car for the value of its parts) on July 8, 2011—13 days after the sale. Mecum Ex N, ECF No. 159-14, at Bates No. MA_079. Pardo disputes this timeline, but he does not effectively contradict Mecum's documentation of mailing on July 8.[6] Later Russo later tried to physically hand the title back to Frank Mecum at a restaurant, but he refused it. Russo retained the title until mailing it to Pardo on November 15, 2011. Russo did not endorse the title to Pardo, however, and Russo explains that he declined to sign the title because he was not the owner. Pardo says he first learned that the car had been titled in Billy Bob's name when he finally received the title card from Russo.[7] Mecum did not respond to Pardo's requests to take Billy Bob's name off the title.

---

[6] Russo testified that he did not receive title "immediately after the auction," and that he did not know the "exact date" but that it "was a while" after some "discussions" with Dana Mecum. He repeatedly stated that he did not remember the exact date he received the title. Pardo emphasizes that Russo did not receive the title until after reporting to Mecum about his inspection—but Russo reported his results by phone immediately after the inspection, and therefore long before writing the report of July 25. Therefore, Pardo does not effectively dispute the date on which Mecum mailed the title certificate.

[7] This assertion is in tension with the undisputed fact that two days after the sale Pardo sent materials to Russo enabling him to obtain temporary tags for the vehicle. Pardo offers no explanation why he involved Russo in obtaining the tags if he did not know that the car was titled to Billy Bob's.

Kevin Mackay estimated that the car had no value. Russo guessed that it was worth $70,000, in parts. Pardo, who now also claims the car is worthless, maintains $100,000 in property and liability insurance on the car.

2. **Discussion**

The parties agree that Illinois law applies to the contract claim in this lawsuit based on diversity jurisdiction.[8] Under Illinois law, contractual language will be applied as written, giving the plain and ordinary meaning to the terms, unless there is ambiguity. *See Standard Mut. Ins. Co. v. Lay*, 2013 IL 114617, ¶ 24, 989 N.E.2d 591, 597; *Buenz v. Frontline Transp. Co.*, 227 Ill. 2d 302, 308, 882 N.E.2d 525, 528–29 (2008) ("The cardinal rule of contract interpretation is to discern the parties' intent from the contract language."). The parties here have not identified any ambiguity in the contract provisions at issue, nor does the Court find that those terms are "reasonably susceptible" to multiple meanings. *Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359, 371, 875 N.E.2d 1082, 1090 (2007) ("A contract is not rendered ambiguous merely because the parties disagree on its meaning.").

For purposes of this discussion, even though these facts are disputed, the Court assumes in Pardo's favor that the car he purchased is not legally a 1967 black Corvette. The Court also assumes in Pardo's favor—although it finds this assertion highly dubious, see n.6, *supra*— that he did not authorize the title of the car to be placed in Billy-Bob's name. Even so, his claim fails based upon the contractual term on which it is premised.

---

[8] Pardo is a citizen of New York; Mecum a citizen of Delaware and Wisconsin. The amount in controversy when the case was filed potentially exceeded $75,000; Pardo paid $72,610, for the car including the auctioneer's commission, and the incidental expenses associated with the sale, such as travel, transporting, inspecting and appraising, and insuring the car, though not specifically quantified in the complaint, could reasonably have been expected to bring a potential damage award over the jurisdictional threshold.

The key provision at issue, on which Pardo bases his claim, is the title-processing provision: "Titles on purchased vehicles will be processed in 14 working days contingent upon confirmed payment." In seeking judgment, Mecum contends that there was (1) no breach of this requirement and (2) no damages arising from its processing of the title. As to the first point, it argues that Pardo purchased a Corvette that concededly did not have all OEM (original equipment manufacturer) parts — but that it is *legally* a 1967 Corvette given its title history and VIN, and the "controlling effect" of the agreement. (This refers to a provision in the contract stating that Mecum's records control in the event of any dispute arising after sale; all of Mecum's records identify the car as a 1967 Corvette coupe.)

Pardo contends that he is entitled to judgment because he has conclusively shown that shown that "Mecum has breached the contract by failing to deliver negotiable title to Pardo, now more than five years after the auction and Pardo's payment for the Car pursuant to his obligation under the contract." Mecum, in opposition, simply rests on the contractual language and its records showing that it mailed the processed title to Billy Bob's within 14 days of the purchase. Because the title matches the vehicle purchased by Pardo, and the certificate of title is presumptively accurate under Illinois law, no issue of the vehicle's authenticity intrudes on the question of whether it complied with title processing provision, says Mecum.

The record establishes that Mecum transferred[9] and processed[10] and the car's title within 14 ("working") days of payment, as required by the contract. Therefore, a breach of the title

---

[9] The contract says nothing about *delivering* title within 14 days, although the parties (and the Court) have occasionally slipped into this terminology. The title here was signed over on the day of purchase.

[10] Presumably, that means to perform the steps necessary to transfer title under state law, namely, to submit the vehicle title transfer and registration paperwork with the supporting documentation to the DMV and to pay the taxes and title and registration fees. (*See, e.g.*, 625

provision occurred only if it required Mecum was required to transfer negotiable title *to Pardo* within 14 days. For this, the Court must resort to the plain meaning of the title-processing provision. Despite Pardo's statement that Mecum breached the contract by "failing to deliver negotiable title to the Corvette at issue in this case." Mot. 1, ECF No. 165, nothing in the contractual language supports this view. Pardo does not point to any contractual provision that was violated by transferring the title to Billy Bob's, with or without his consent (which is not to say it wasn't otherwise unlawful). The title provision simply requires "processing," upon confirmation of payment, within 14 business days; the title in this case was transferred and processed within that time period.

Further, nothing in the contract obligates Mecum to transfer title to the purchaser. Nor does the law impose such a requirement, such that it could be read into the title provision of the contract. "It is possible that one can own an automobile even though the certificate of title is in the name of another." *Dan Pilson Auto Ctr., Inc. v. DeMarco*, 156 Ill. App. 3d 617, 620–21, 509 N.E.2d 159, 161 (1987) (citing cases); see also *Libertyville Toyota v. U.S. Bank*, 371 Ill. App. 3d 1009, 1013, 864 N.E.2d 850, 854 (2007); *ITT Commercial Fin. Corp. v. Unlimited Auto., Inc.*, 166 B.R. 637, 644–45 (N.D. Ill. 1994) ("In any event, under Illinois law, a transfer of a certificate of title is not necessarily determinative of ownership of a vehicle . . . It is possible that one can own a vehicle even though the certificate of title is in the name of another."). This depends on the "the intent of the parties involved." *Id*. Given that Pardo's driver's license and

---

ILCS 5/3-104 ("Application for certificate of title"); "Registering / Titling a Vehicle in New York State, available at: https://dmv.ny.gov/forms/mv821.pdf).

insurance policy were used to obtain tags for the car, and Pardo's maintenance of insurance on the car, it can be reasonably inferred that the parties involved intended Pardo to be the owner.[11]

If Mecum wrongfully transferred the title to Billy Bob's, without Pardo's knowledge or consent as Pardo contends, then he might have recourse, perhaps in the form of a claim that would address the questions of agency and actual and apparent authority. But Pardo has asserted and defended—indeed, has affirmatively moved for judgment on—only a contract claim premised on a term that does not impose the obligations on Mecum that he posits.[12] He does not raise other arguments or theories of relief based on the allegation that the transfer was unauthorized. This is not said to invite further litigation of this relatively modest but nevertheless long-running dispute, but to illustrate the unavailability of a contract remedy as between Pardo and Mecum pursuant to the title-processing clause in the bidder's agreement. That agreement simply does not say that Mecum was obligated to transfer title to Pardo himself or "deliver" it to him within 14 days. As set forth above, Illinois law permits ownership without title. Even

---

[11] There does not appear to be any dispute at all that Pardo, not Billy Bob's, owns the vehicle, notwithstanding that the title certificate is in the name of Billy Bob's Fast Expensive Cars. Robert Russo did not want, and has never claimed, to own the car—one reason, legitimate or not, that he refuses to sign it over to Pardo.

[12] It is axiomatic that a plaintiff is not required to plead legal theories in a complaint. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015). Further, he may "refine [his legal theory] at summary judgment based on evidence produced in discovery." *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015). But while the existence of any possible theory of relief will protect a complaint, in defending against a summary judgment motion (or, as here, moving for judgment too), the plaintiff must identify a viable legal basis for relief based upon the record. Fed. R. Civ. P. 56(a); *United States v. Ritz*, 721 F.3d 825, 827 (7th Cir. 2013); *Transamerica Fin. Servs., Inc. v. Sykes*, 171 F.3d 553, 555 (7th Cir. 1999). Pardo has not only defended but affirmatively moved for judgment on the basis of the title-processing provision, not any other common-law or other theory of relief (apart from those already dismissed).

assuming, as the Court does, that Pardo did not authorize the transfer to Billy-Bob's, the contract provision he cites provides no relief.[13]

The same is true regarding Pardo's claim that the breach also stems from the failure to provide "negotiable" title. The title processing provision in the bidder's agreement does not expressly impose this requirement, although Mecum does not deny that as part of its initial entry process for cars, "we guarantee good title and we check the serial number on the car to make sure it has a valid serial number and that the serial number matches the title." Pl. Ex. B. 18:7-12. It does not, however, "take every title and check the history of the car back indefinitely" or purport to guarantee originality, authenticity or condition. Here, title was legally transferred and processed from Mecum to Billy Bob's after the auction—a strong indication that title was not "non-negotiable."[14] A certificate of title issued by the Illinois Secretary of State is *prima facie* good. See 625 ILCS 5/3-107(c) ("A certificate of title issued by the Secretary of State is prima facie evidence of the facts appearing on it."); *see also id*. § 5/3-107(a) (listing the facts required to appear on a title certificate); *Allin v. City of Springfield*, 845 F.3d 858, 863 (7th Cir. 2017); S*paulding v. Peoples State Bank of Bloomington*, 25 Ill. App. 3d 118, 120, 323 N.E.2d 143, 145 (1975). Pardo does not address this argument, and he did not challenge the title with the Illinois Secretary of State, even though he believed that in light of expert inspections the presumption of truth could be rebutted as to the listed "year-model," see § 3-107(a)(5), on the certificate.

---

[13] Dana Mecum testified that the 14-day title processing provision in the standard bidder agreement is a protection for Mecum, not the buyer. In his view, it means that "we do not give you the title until we have confirmed that you have paid for it," as a "safety to make sure that somebody doesn't give you a bad check and they leave with the car and the title." Pl Ex. B at 47-48. This understanding is consistent with the contractual language, whereas Pardo's interpretation requires reading various requirements into the plain language.

[14] This opinion might have been given to Pardo by his inspector, Mr. Mackay, but this is a legal question.

Mecum further argues that Pardo has suffered no damages, and the Court agrees that this is another reason that Pardo cannot succeed on the contract claim. A better framing of the argument is that he cannot show that he is damaged *by a breach of the title provision*. Assume that Mecum did not timely process the title and transfer it to Pardo, in breach of the contract. What would the damages be for such a breach? Absent a specific missed opportunity to resell the Franken-vehicle during the additional waiting period—something not claimed here—the Court struggles to think of any. And Pardo does not supply the answer in his briefs. If, as he contends, the car is "worthless," and cannot be driven or sold, those injuries must be traceable to the contractual obligation **to timely process title**, not to the authenticity issues, the absence of a market for patched-together Corvettes, or something else unrelated to the contract's title provision. (Whether the car is indeed worthless or drivable is another unanswered, if irrelevant, question, in light of Russo's assessment of the value of the parts at $70,000 and Pardo's maintenance of a $100,000 insurance policy on the car).

The damages Pardo requests in his Second Amended Complaint consist of "all compensatory damages . . . including the price paid for the 1967 Corvette Coupe, the commission paid to Mecum, the expenses incurred in shipping the vehicle to New York, [and] the expenses incurred in having the vehicle appraised by experts."[15] At summary judgment, however, Pardo fails to link these alleged damages with the breach of the title provision requiring processing within 14 days, assuming for the sake of argument that such a breach occurred. As noted, nothing in the contract required Mecum to title the car in Pardo's name or to physically *deliver* it to Pardo (or to Billy Bob's, for that matter) within 14 days. But an award of

---

[15] Pardo also asks for attorneys' fees as damages, but of course fees are not available in a breach-of-contract claim unless the contract provides for them.

compensatory damages would rest on this premise, or else on proof of fraud, but that ship sailed long ago because Pardo disclaimed all reliance and accepted the car it as-is.

Pardo therefore focuses now on rescission as his "only" and best remedy for the alleged breach of contract.[16] Mem. 15, ECF No. 167. But rescission is not available here. Rescission is the cancelling of a contract so as to restore the parties to their initial status. *Freedberg v. Ohio Nat. Ins. Co.*, 2012 IL App (1st) 110938, ¶ 27, 975 N.E.2d 1189, 1197. It is a remedy to the injured party for a contract voidable for material misrepresentation. *See id.*; *Jordan v. Knafel*, 378 Ill. App. 3d 219, 229, 880 N.E.2d 1061, 1069 (2007). Or, it can be used to remedy a contract voidable due to a mutual mistake. *All. Prop. Mgmt., Ltd. v. Forest Villa of Countryside Condo. Ass'n*, 2015 IL App (1st) 150169, ¶ 39, 47 N.E.3d 1142, 1151. Finally, rescission can be appropriate where "there has been substantial nonperformance or a substantial breach by another party." *Lempa v. Finkel*, 278 Ill. App. 3d 417, 426, 663 N.E.2d 158, 165 (1996).

Here, Pardo says the contract is voidable for "substantial nonperformance and fraud." Mem. 15, ECF No. 167. To repeat, Pardo cannot premise relief on fraud in the inducement where he disclaimed reliance on *anyone's* representations about the car and agreed to accept the car as-is. Detrimental reliance, a key element, is missing. *See Jordan*, 378 Ill. App. 3d at 229, 880 N.E.2d at 1069; *Harvey v. Fitzpatrick*, 2012 IL App (1st) 110775, ¶ 40. As for "substantial nonperformance," the Court already concluded that Pardo failed to establish a breach or nonperformance of the title- processing clause, let alone a "substantial" one that would allow for the extraordinary remedy of rescission.

---

[16] Somewhat paradoxically, however, he continues to argue, in response to Mecum's argument, that he does have compensatory damages because he did not receive the benefit of the bargain (despite receiving the car he bought). *See, e.g.,* Reply 7, ECF No. 173.

Finally, Pardo presses arguments about Mecum's role as the seller. Pardo emphasizes this fact primarily in his reconsideration motion, but it also looms in his summary-judgment arguments regarding rescission. *See, e.g.*, Mem. 12, ECF No. 167 (arguing that non-reliance clause does not apply because Mecum as seller misrepresented the car was a black 1967 model year Corvette and "Mecum, in its role as seller of the Car, is . . . liable for breach of those express warranties and for fraud because the Car was in fact not a 1967 model year Corvette.") As the Court has already pointed out, however, the complaint on which Pardo seeks judgment alleges that the seller is Bill Mullis. Pardo has not amended that complaint and cannot now amend a core factual allegation. In any event, this is a limited breach-of-contract action premised on Mecum Auction failing to process title within 14 days. The identity of the seller is immaterial to such a claim.[17] The obligation to process title was with Mecum Auction. It simply does not matter for purposes of the title-processing provision that The Mecum Collection Inc. was the seller. The only obligation of the seller was to "afford every opportunity to view all lots prior to sale." That is not the provision underlying Pardo's contract and rescission claims.

---

[17] Furthermore, Pardo's view that the as-is and non-reliance provisions that bind him do not apply to representations by the seller. The provision states: "The seller [in this case, Mecum] will afford every opportunity to view all lots prior to sale. However the purchaser must understand that he/she is buying property entirely upon his own or his agent's personal examination, inspection and opinion. All lots are sold 'AS IS, WHERE IS.' Any guarantees written or implied as to the authenticity, originality, or condition of any lot are not the guarantee of the Auction Company [also Mecum], and should be determined by the purchaser's own inspection and discretion. The vehicle and information presented at the time of auction is final and supersede any previous representations. The information provided is deemed reliable, but is not guaranteed." There is no qualification in the provision that "the purchaser must understand that he/she is buying property entirely upon his own or his agent's personal examination, inspection and opinion" and that the cars "are sold 'AS IS, WHERE IS." This provision binds the bidder, and nothing suggests that its applicability depends on who made representations.

\* \* \* \* \*

In short, Pardo bought a car he didn't want, and believes he was tricked into doing so. But his fraud claims failed, and he cannot obtain the same remedies by claiming that Mecum breached a ministerial title-processing provision by failing to timely deliver title to the very car that he did not want and is still trying to give back. Pardo *does not want title*; he wants to rescind the sale. Even assuming all facts and drawing all reasonable inferences in Pardo's favor, Mecum Auction is entitled to judgment as a matter of law because Pardo cannot establish a breach of the title-processing provision, his only theory of relief that remains. Therefore, Pardo's motion for reconsideration and summary judgment is denied and Mecum's summary-judgment motion is granted. Judgment is granted in Mecum's favor and this case is terminated.

Date: March 31, 2017

John J. Tharp, Jr.
United States District Judge